# Exhibit D

DISTRICT COURT OF THE STATE OF UTAH
FOURTH JUDICIAL DISTRICT
UTAH COUNTY

GARTH O. GREEN ENTERPRISES, )
INC., a Utah corporation,    ) Case No. 130400184
                             )
         Plaintiff,          ) DEPOSITION OF:
                             ) RICHARD N. REESE
v.                           )
                             ) TAKEN:
RANDALL HARWARD, an individual; ) September 23, 2013
RICHARD HARWARD, an individual; )
HARWARD IRRIGATION SYSTEMS   ) Judge: Laycock
INC., a Utah corporation;    )
GRASS VALLEY HOLDINGS L.P.;  )
DOES 1-10; and ROE CORPORATIONS )
I-X,                         )
                             )
         Defendants.         )
_____)

     Deposition of RICHARD N. REESE, taken on
behalf of the Plaintiff, at the offices of Standard
Plumbing 9150 South 300 West, Sandy, Utah, before Jill C.
Dunford, Certified Shorthand Reporter, pursuant to
Notice.

---

I N D E X

WITNESS                                           PAGE

RICHARD N. REESE

   Examination by Mr. Dunn                         4

   Examination by Mr. Olsen                        47


INDEX TO EXHIBITS

EXHIBITS                                          PAGE

No. 1    Asset Purchase and Sale                   37
         Agreement
         Harward 000085 - Harward 000103

                      -oo0oo-

3

---

A P P E A R A N C E S

For the Plaintiff:     Adam C. Dunn
                       DUNN LAW FIRM
                       110 West Tabernacle
                       P.O. Box 2318
                       St. George, Utah 84770

For the Defendants:    Sonny J. Olsen
                       AXIOM LEGAL
                       730 South Sleep Ridge Drive
                       Suite 300
                       Orem, Utah 84058

For the Witness:       James T. Burton
                       KIRTON & McCONKIE
                       1800 World Trade Center
                       60 East South Temple
                       Salt lake City, Utah 84111

                       Miles Romney
                       STANDARD PLUMBING SUPPLY CO.
                       In-House Counsel
                       9310 South 370 West
                       Sandy, Utah 84070

Also Present: Mike and Garth Green

2

---

```
1    September 23, 2013                    8:40 a.m.
2                    P R O C E E D I N G S
3                      RICHARD N. REESE,
4    called as a witness herein, having been first duly sworn
5    by the Certified Court Reporter to speak to the truth,
6    was examined and testified as follows:
7                         EXAMINATION
8    (BY MR. DUNN)
9         Q.  Mr. Reese, my name is Adam Dunn.  I represent
10   Garth O. Green Enterprises.  Is it okay if I call that
11   company Southwest today?
12        A.  That's fine.
13        Q.  Thanks.  Have you ever had your deposition
14   taken before?
15        A.  Yes, I have.
16        Q.  Approximately how many times?
17        A.  Just once.
18        Q.  What was the nature of that case?
19        A.  It was an International Trade Commission
20   case.
21        Q.  How long ago was that deposition?
22        A.  Earlier this year.
23        Q.  Before that you hadn't been deposed?
24        A.  Not that I remember.
25        Q.  A couple of things on your deposition.
```

4

**Page 5**

```
 1          Today you have taken the oath that you would take
 2   in a court of law. I'm entitled to your best
 3   recollection as well as your best estimate.
 4          Do you understand what I mean when I say
 5   "estimate"?
 6      A. Tell me what an estimate means.
 7      Q. Well, what I mean when I say an estimate is
 8   if I were to ask you approximately how long this table
 9   is, you could give me an estimate.
10          But if I asked you approximately how long my desk
11   is in my office, you couldn't because you have never seen
12   it. It would be really just a guess.
13          Is that clear?
14      A. That's clear.
15      Q. Excellent. Is there anything that would
16   impair your ability to give full and accurate testimony
17   today? Any medications? Any other difficulties?
18      A. No.
19      Q. Also, the court reporter is taking down
20   everything we say to preserve a record. We'll be using
21   that record as we go forward in this litigation as well
22   as perhaps at the stage of trial. And as a result, I
23   would ask you don't speak over me and I'll do my best to
24   not speak over you.
25          Is that okay?
```

**Page 6**

```
 1      A. Yes.
 2      Q. Also, from time to time your attorney or
 3   attorneys -- I suppose you are represented by both these
 4   gentlemen here -- may object. Mr. Olsen may also object.
 5   In spite of the objections, unless they counsel you to
 6   not answer the question, I'd ask that you answer the
 7   question.
 8          Is that clear?
 9      A. Yes.
10      Q. Mr. Reese, if you would, give your business
11   address for the record.
12      A. 9310 South 370 West, Sandy, Utah.
13      Q. Thank you. And what is your educational
14   background?
15      A. I am a high school graduate and I have three
16   years of college.
17      Q. Where did you go to college?
18      A. The University of Utah, LDS Business College,
19   and BYU.
20      Q. What did you study while you were in college?
21      A. Business.
22      Q. If you could, just briefly give me your
23   employment history.
24      A. I have worked for Standard Plumbing Supply
25   Company since -- full-time since 1982.
```

**Page 7**

```
 1      Q. What is your current position with Standard
 2   Plumbing?
 3      A. I'm the president.
 4      Q. How long have you been the president?
 5      A. Since 1992.
 6      Q. Now, are you familiar with the Harwards?
 7   I'll call them the Harwards.
 8      A. Yes.
 9      Q. Is it okay if I refer to their business as
10   Sprinkler World today?
11      A. Yes.
12      Q. Today we are here to ask you some questions
13   about your involvement with Sprinkler World, a little bit
14   of history going back, not too long, but over the last
15   year, year and a half, two years.
16          When did you first learn that Sprinkler World was
17   for sale?
18      A. January 4th.
19      Q. January 4th of what year?
20      A. Of 2013.
21      Q. And before that date, had you heard from
22   anyone that Sprinkler World was for sale?
23      A. Many years ago Randall had come to my office,
24   I think it was probably in 2010, and tried to -- he was
25   looking for financing for his business to get him through
```

**Page 8**

```
 1   the wintertime and he mentioned at that time that --
 2   about selling the business. At the time I had no
 3   interest.
 4      Q. Why did you have no interest at that time?
 5      A. We were in the middle of the housing
 6   depression and he threw numbers out that were very high
 7   and I didn't really think he was very serious.
 8      Q. Why didn't you think he was very serious?
 9      A. Because the numbers were high and he was
10   asking for financing at the same time.
11      Q. Do you recall what the numbers were?
12      A. I think he wanted $2 million.
13      Q. And what did you understand you would be
14   buying for the $2 million back in 2010?
15      A. We never discussed it more about what he was
16   selling outside of he had his business and he was looking
17   for financing and wanted -- and said, "Or you could buy
18   it for $2 million."
19      Q. Between 2010 and January 4th of 2013, did you
20   have any conversations with anyone from Sprinkler World
21   about purchasing their business?
22      A. No.
23      Q. Now, let's fast forward to January 4th, 2013.
24   How did you learn that Sprinkler World was for sale?
25      A. I got a call from Gary Golightly. He left a
```

**Page 9**

```
 1  message.
 2      Q. Who is Gary Golightly?
 3      A. He's the owner of Sprinkler Supply.
 4      Q. And what is Sprinkler Supply?
 5      A. They are a wholesale distributor of sprinkler
 6  parts in this market.
 7      Q. And what did he say in his message?
 8      A. He said that Sprinkler World was going to
 9  sell to Southwest and he wanted to talk to me about it.
10      Q. Anything else in that message?
11      A. Not that I remember.
12      Q. Then what did you do once you received that
13  message?
14      A. That was on Friday. I called him Monday.
15      Q. So I want to make sure that my math is
16  correct. January 4th was a Friday?
17      A. Yes.
18      Q. So 5th, 6th, you called him on the 7th?
19      A. Yes.
20      Q. Do you recall approximately what time of day
21  you called him on the 7th?
22      A. No. I believe it was before -- it was in the
23  morning hours.
24      Q. Would it have been first thing in the
25  morning?
```

**Page 10**

```
 1      A. I don't think so.
 2      Q. And what did you discuss with Mr. Golightly
 3  in the morning of January 7th, 2013?
 4      A. He told me that Sprinkler World was for sale
 5  and that they were entertaining offers and that they were
 6  going to sell to Southwest Plumbing Supply, from what he
 7  had heard.
 8      Q. When you say he told you that they were
 9  entertaining offers, did he tell you how he knew they
10  were entertaining offers?
11      A. He didn't tell me how he came up with the
12  information.
13      Q. Did he tell you anything else?
14      A. He said, "You should go buy them."
15      Q. Did he tell you why you should go buy them?
16      A. I came back to him and said, "No, you should
17  go buy them."
18      Q. But did he tell you why you should buy it?
19      A. No.
20      Q. Why did you tell him he should buy Sprinkler
21  World?
22      A. Because he's heavily invested in the
23  sprinkler business.
24      Q. What else did you and Mr. Golightly discuss
25  on January 7th, 2013?
```

**Page 11**

```
 1      A. This is all we discussed.
 2      Q. Do you recall approximately how long that
 3  phone conversation was?
 4      A. I don't remember exactly.
 5      Q. Do you have an estimate?
 6      A. Not that would be anything but a guess.
 7      Q. Using guess and estimate like I did at the
 8  beginning. Good job.
 9      What did you do after you hung up with
10  Mr. Golightly?
11          MR. BURTON: Objection. Vague.
12      Q. (BY MR. DUNN) With the information that
13  Mr. Golightly gave you, what did you do when you hung up
14  with him?
15      A. Later on I called Randall.
16      Q. Later on on the 7th?
17      A. On the 7th.
18      Q. Do you recall approximately what time you
19  called? And that's Randall Harward I assume you are
20  referring to. Is that correct?
21      A. Yes.
22      Q. Do you recall what time you called Randall
23  Harward?
24      A. It would have been in the early afternoon, I
25  think.
```

**Page 12**

```
 1      Q. What did you say to Randall Harward in that
 2  phone conversation?
 3      A. I asked Randall if he was selling to
 4  Southwest.
 5      Q. And what did Mr. Harward tell you?
 6      A. He said that he had received an offer from
 7  them. That the paperwork had shown up and it was
 8  different than what he thought he had agreed to. I asked
 9  him if the deal was done and he said no, it wasn't done.
10      Q. What else did you say to Mr. Harward?
11      A. I asked him if he was interested in
12  entertaining an offer from us and he said he was.
13      Q. What else did you say to Mr. Harward in that
14  phone conversation?
15      A. I asked him once he told me that he was
16  interested in speaking with us, I told -- I asked him if
17  I could come down and see him.
18      Q. What else did you say?
19      A. I don't recollect any more.
20      Q. Did you discuss any numbers?
21      A. Not at that time.
22      Q. You mentioned as I have asked some of these
23  questions of what you said to Mr. Harward, you have
24  mentioned some of the things that he said to you in that
25  phone conversation.
```

```
 1        Prior to January 4th, 2013, did you have any
 2   access to accounts receivable information or inventory
 3   information of Sprinkler World?
 4        A.  No.
 5        Q.  Did you know where their retail locations
 6   were?
 7        A.  Yes.
 8        Q.  And where were they?
 9        A.  Roosevelt, Sandy, Lehi, Orem, and Spanish
10   Fork, Springville.
11        Q.  I noticed as I drove up the road there was a
12   Sprinkler World and then I think a couple of doors down
13   there's a Standard Plumbing Supply?
14        A.  Yes.
15        Q.  How are the two retail businesses different?
16            MR. BURTON:  Objection to the form of the
17   question.
18        Q.  (BY MR. DUNN)  Go ahead and answer, if you
19   can.
20        A.  We basically sell to subcontractors.  We sell
21   them supplies, supplies that go into housing in
22   industrial complexes.  We extend credit.  We purchase
23   from manufacturers.  We handle deliveries.  They are
24   commonality of wholesale retail businesses.
25        Q.  So how is Sprinkler World, that retail world
                                                          17
```

```
 1   but the paperwork was different than what they had felt
 2   it should have been, and they thought they didn't have a
 3   deal.
 4        I asked them if they wanted to entertain a deal
 5   from Standard Plumbing Supply Company.  And the other
 6   brothers were there and they said they were very
 7   interested in entertaining a proposal from us.  And they
 8   gave me a few outlines for things that they were looking
 9   for.  Primarily they told me how much inventory they had,
10   how they would be willing to discount that inventory to
11   some extent.
12        They gave me an ad basically of what fixed assets
13   they had and what they were looking for to lease the
14   buildings.
15        Q.  Anything else in that outline that they had
16   given you?
17        A.  They spoke about their payables.  They told
18   us what their payables were.  And we discussed if there
19   were any other lease obligations that they might have.
20        Q.  What did they -- in that outline what did
21   they tell you about the inventory?
22        A.  They told us they had a million and a half,
23   approximately, and that they were looking to sell the
24   inventory for a million, one.
25        Q.  What did you tell them about that number, if
                                                          19
```

```
 1   location just a couple of doors down from Sprinkler
 2   World, how is it different from Standard just two doors
 3   down?
 4        A.  They sell sprinkler parts.  The location that
 5   you are referring to sells heating and air-conditioning
 6   equipment.
 7        Q.  Now, is there anything else that you could
 8   recall from your afternoon phone conversation with
 9   Randall Harward on January 7th to your afternoon meeting
10   with Randall Harward on January 8th of what you did with
11   regard to Sprinkler World?
12        A.  Outside of visiting with Gary Golightly on
13   and off during that period of time, I had a business to
14   run.  That's why I couldn't go see them until the
15   afternoon.  I had appointments that morning and that was
16   the soonest I could get there and I didn't really have
17   the time to invest anything.  Besides that, I hadn't
18   really confirmed from them that they really were in a
19   position to even sell the business.
20        Q.  Okay.  Now let's talk about the afternoon
21   meeting on January 8th.  What did you talk about in that
22   meeting?
23        A.  I asked them if they had an offer from
24   Southwest and if the deal was done.  And they said that
25   they had discussed with Southwest buying the business,
                                                          18
```

```
 1   anything?
 2        A.  We were on the same computer system, so I
 3   asked them how they came up with that number and they
 4   said that they had looked at a sales history analysis and
 5   these were items that hadn't sold within a certain period
 6   of time.  They had discounted those by 85 percent or
 7   something like that.  So they had discounted the slow
 8   moving inventory down to 15 cents on the dollar.  The
 9   regular moving inventory they had discounted to 85 cents
10   on the dollar.
11        Q.  Did you tell them anything else about what
12   you felt about that number?
13        A.  No.  We bought a fair number of businesses
14   over the last year or so, and so I didn't think that it
15   was an unreasonable number for inventory and it was
16   always subject to final count anyway.
17        Q.  What do you mean by that?
18        A.  When you buy a business, you make an offer,
19   they accept the offer, you basically close, and you have
20   a period of time to go back and review the numbers that
21   have been represented to you to make sure that they are
22   correct and you adjust the payment accordingly.
23        Q.  And so it was your understanding that once
24   you assessed the actual inventory, that number could be
25   adjusted?
                                                          20
```

```
 1  in pieces.  Thank you.
 2       So you had this discussion with Mr. Harward where
 3  you are talking about the viability of the discussions
 4  between the Plaintiff and the Defendant; right?
 5       A.  Yes.
 6          MR. DUNN:  I'll object as to assuming facts
 7  not in evidence.
 8       Q.  (BY MR. OLSEN)  Now, that conversation is
 9  crucial.  And so I want to know during that conversation
10  with Mr. Harward, did Mr. Harward, Mr. Randall Harward,
11  indicate to you that he was going to -- I'm going to say
12  breach, I'm just going to use the term breach.  Do you
13  know what I mean by breach?
14       A.  Yes.
15       Q.  Did he say he was just going to breach the
16  agreement with Southwest?
17       A.  No.
18       Q.  Did anyone, any of the Defendants just come
19  right out and say, "You know what?  We're not going to
20  deal with them.  We got a better offer from you, let's
21  just move forward"?  Anything like that?
22       A.  When I visited with them on Tuesday, they
23  represented to me that they had been in discussions but
24  they had not consummated the deal and that the paperwork
25  was different than what they felt they had agreed to.
                                                         49
```

```
 1       Q.  Okay.
 2       A.  So I asked them, I said, "So are we free to
 3  negotiate and discuss this?  I'm not interfering with
 4  their contract?"  And they said, "We don't have one yet."
 5       Q.  To be fair to you, I'm just going to ask you
 6  -- and thank you for that -- I'm just going to ask you to
 7  look at the totality of your observations during this
 8  conversation.  Okay?  And I'm just asking about what your
 9  observations were regarding what the Defendants were
10  doing with respect to this purported agreement.  Okay?
11  So just think about your observations.
12       As you observed Mr. Harward, did he do anything,
13  did he manifest any outward expression, whether with
14  words or with gestures, that they were just going to
15  flout this agreement, just knowingly flout it, just
16  forget about it?
17       A.  No.  No, they -- they represented they were
18  free to entertain an offer from us and we told them we'd
19  make them an offer.  And then we finally negotiated the
20  offer after the text had come that said the deal is off.
21       Q.  Now, my last question is did any of the
22  Defendants explain to you or comment to you that the
23  Defendants were in an exclusive arrangement with
24  Southwest in any way during any of these proceedings?
25       A.  No.
                                                         50
```

```
 1          MR. OLSEN:  That's all I have.
 2          MR. DUNN:  That's all I have, Mr. Reese.
 3  Counsel, would you like to read and sign?
 4          MR. BURTON:  I have no questions.
 5          MR. DUNN:  Would you like to read and sign?
 6          MR. BURTON:  Yes, I would.
 7       (The deposition was concluded at 10:00 a.m.)
 8                        -ooOoo-
                                                         51
```

```
 1                     C E R T I F I C A T E

 3          I, JILL C. DUNFORD, Registered
 4  Professional Reporter, certify:
 5          That the foregoing deposition of RICHARD
 6  N. REESE was taken before me pursuant to Notice at the
 7  time and place therein set forth, at which time the
 8  witness was put under oath by me;
 9          That the testimony of the witness and
10  all objections made at the time of the examination were
11  recorded stenographically by me and were thereafter
12  transcribed under my direction;
13          I FURTHER CERTIFY that I am neither
14  counsel for nor related to any party to said action nor
15  in any way interested in the outcome thereof.
16          Certified and dated this ____ day
17  of____, 2013.


                    _____
                    JILL C. DUNFORD, CSR, RPR, RMR
20                  Certified Shorthand Reporter
                    for the State of Utah
                                                         52
```